ADVOCATES FOR the ARTS et al.,
Plaintiffs-Appellants,

v.

Meldrim THOMSON, Jr., etc., et al.,
Defendants-Appellees.

No. 75–1346.

United States Court of Appeals,
First Circuit.

Argued Dec. 1, 1975.

Decided March 31, 1976.

Howard B. Myers with whom Ingram &
Myers, Concord, N.H., Howard M. Squad-

ron, Harvey Horowitz and Squadron, Gartenberg, Ellenoff & Present, New York City, were on brief, for plaintiffs-appellants.

Edward A. Haffer, Asst. Atty. Gen., Concord, N.H., with whom Warren B. Rudman, Atty. Gen., Concord, N.H., was on brief, for defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The question in this case is whether the first amendment permits the Governor and Council of New Hampshire to refuse a grant-in-aid to a literary magazine because they regard a poem appearing in a past issue of the magazine as an "item of filth." The district court, treating the defendants' motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 12(b) and 56, found no first amendment violation. 397 F.Supp. 1048 (D.N.H.1975). We agree.

In 1965 Congress established the National Foundation on the Arts and the Humanities, 20 U.S.C. § 951 *et seq.*, in order "to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent . . . ." *Id.* § 951(5). Within this foundation Congress established a National Endowment for the Arts with responsibility for awarding grants-in-aid, both directly to those groups and individuals whose artistic endeavors "have substantial artistic and cultural significance,". *id.* § 954(c)(1), or are otherwise worthy of public support, *id.* § 954(c)(2)–(5), and indirectly through state agencies established to serve the same purposes, *id.* § 954(g).

Responding to the federal legislation, the New Hampshire legislature established the New Hampshire Commission on the Arts (the Commission) to administer the grant program in New Hampshire. N.H.Rev. Stats.Ann. ch. 19–A. The legislature declared that "all activities undertaken by the state in carrying out [the program] shall be directed toward encouraging and assisting rather than in any ways limiting the freedom of artistic expression that is essential for the well-being of the arts." *Id.* ch. 19–A:1. At first the legislature made no provision for executive review of the Commission's funding decisions, but under general provisions of the New Hampshire Constitution and laws calling for approval of treasury disbursements and department expenditures, N.H.Const., pt. 2, art. 56; N.H. Rev.Stats.Ann. ch. 4:15, the practice evolved that Commission grants of over $500.00 were submitted to the Governor and Council for their approval before becoming final. On July 5, 1975, while this litigation was before the district court, the legislature specifically provided for such approval by amendment to chapter 19–A. *Id.* ch. 19–A:6(VI) (Supp.1975).

*Granite* is a journal of poetry, fiction, translations and letters that was first published in the spring of 1971. The first three issues, appearing in 1971–1972, were privately funded. An enlarged fourth issue, entitled *Northern Lights*, was supported by a grant-in-aid voted by the Commission and approved by the Governor and Council in mid-1972. The present controversy arose when *Granite's* publishers applied for a second grant in October 1973. On March 4, 1974, the Commission voted to award a grant of $750.00. The Governor and Council at first determined to approve this grant, at a meeting on May 1, 1974. After the meeting was adjourned, however, the Governor and members of the Council where shown a poem in the *Northern Lights* issue of *Granite* entitled "Castrating the Cat."[1] They then reconvened the meeting and reversed their decision. At the time the Governor characterized the poem as "an item of filth," and in a letter notifying the Commission of the decision not to approve the *Granite* grant-in-aid explained that the magazine had published "obscenities."[2]

---

1. *See* Appendix *infra.*

2. Defendants do not contend, despite this characterization, that either the poem or any prior issue of *Granite* is obscene in the constitutional sense.

The complaint in this suit was filed on April 15, 1975. The plaintiffs are Granite Publications, the nonprofit corporation that publishes *Granite*; Advocates for the Arts, a national organization concerned with promotion of the arts, with members in New Hampshire; an individual member of Advocates of the Arts who resides in New Hampshire; and two individuals whose work appeared in the *Northern Lights* issue of *Granite*, one of whom is also a subscriber to the magazine. The complaint alleged that the Governor and Council, in disapproving the $750.00 grant-in-aid on the basis of their own "personal adverse reaction" to a single poem had violated the first and fourteenth amendments of the Constitution, as well as the federal and state statutes authorizing the grants program, 20 U.S.C. § 954; N.H.Rev.Stats.Ann. ch. 19–A. Under 42 U.S.C. § 1983 the plaintiffs sought declaratory and injunctive relief.

The district court found that federal jurisdiction was proper under 28 U.S.C. § 1331 and that all of the plaintiffs had standing to sue. 397 F.Supp. 1048, 1049–50. On the merits the court sought to identify exactly what governmental conduct had aggrieved the plaintiffs. It considered that "[t]he only action taken by the defendants is their refusal to sanction the grant because, in their judgment, they do not believe the magazine worthy of state support." *Id.* at 1052. Regarding such a "value judgment as to . . . literary worth" as "intrinsic to the benefit being sought," the court could find no first amendment violation. *Id.* at 1052–53. Similarly, the court held that nothing in 20 U.S.C. § 954 prevented state executive review of the funding decisions of a state agency established under that provision, and that such review was not only permitted but required by New Hampshire law. *Id.* at 1053–54.

In this appeal the plaintiffs have chosen not to pursue their statutory claims and ask us only to review that part of the district court's decision holding that their complaint alleged no first amendment violation.

There is no question that this case is properly before us. The plaintiffs' claim that the defendants' reversal of the grant awarded to *Granite* by the Commission stifled free expression raises a substantial federal question for which jurisdiction is plainly afforded by 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. *Cf. Hagans v. Lavine*, 415 U.S. 528, 534–38, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577, 586–89 (1974). Moreover, the claim that as a result of the defendants' action *Granite* was forced to curtail and delay further publishing endeavors was enough to demonstrate that at least the publisher, Granite Publications, had a " 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674, 682 (1974), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 677 (1962). That Granite Publications is a corporation has no bearing on its standing to assert violations of the first and fourteenth amendments under 42 U.S.C. § 1983. *See Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660, 665 (1936). Since we thus find a justiciable controversy between Granite Publications and the defendants under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, we find it unnecessary to consider either whether there is jurisdiction under 28 U.S.C. § 1331, with its "amount in controversy" requirement, or whether any of the other plaintiffs besides the publisher have standing. *Cf. Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201, 210 (1973).

Nor is there any question that if defendants violated the first amendment, federal injunctive relief would be appropriate. The defendants have advanced no administrative remedy that must be exhausted before plaintiffs can assert their first amendment claim in federal court. If refusal of aid to *Granite* restrained freedom of speech, it would be no answer that *Gran-*

*ite* could seek funds directly from the National Endowment for the Arts under 20 U.S.C. § 954(c), *cf. Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448, 457 (1975), or that it could ask the National Endowment to cut off further funding of the New Hampshire Commission under 20 U.S.C. § 954(h), even assuming that that provision were applicable to the alleged violation, *cf.* Van Alstyne, *The First Amendment and the Suppression of Warmongering Propaganda in the United States: Comments and Footnotes*, 31 Law and Contemp.Prob. 530, 535 (1966) ("[T]he remedy of silence is generally not the way of the first amendment."). Nor are the plaintiffs barred from equitable relief by any adequate remedy at law. If the decisional process leading to denial of funds to *Granite* violated the first amendment, as plaintiffs allege, appropriate relief would include an injunction ensuring that the violation does not recur, whether or not *Granite* showed itself to be threatened by recurring violations. *See* Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court*, 71 Yale L.J. 599 (1962).

■ We turn, then, to the merits of the plaintiffs' first amendment claim. We do not, of course, understand plaintiffs to suggest that public funding of the arts is unconstitutional. Such a broadside attack would be undercut by the Supreme Court's interpretation of the first amendment in *Buckley v. Valeo*, 424 U.S. 1, 90, 96 S.Ct. 612, 668–69, 46 L.Ed.2d 659, 728, 44 U.S.L.W. 4127, 4154–55 (U.S. Jan. 30, 1976). There the Court held that the public financing of political campaigns "furthers, not abridges, pertinent First Amendment values. . . ." *Id.*, 424 U.S. at 93, 96 S.Ct. at 670, 46 L.Ed.2d at 730, 44 U.S.L.W. at 4154. The plaintiffs' claim is rather that a decision not to fund a particular arts project such as *Granite* based on nothing more than personal preferences constitutes a prior restraint of free expression. While they would not, apparently, subject public funding decisions to the full panoply of procedural safeguards applicable to official actions regulating expression in public

places, *see, e. g., Southeastern Promotions, supra,* they urge that "narrow standards and guidelines" are constitutionally required to ensure that funding decisions be based on "literary or artistic merit" rather than on the decision maker's "prejudices or his disagreement with what is being said. . . . " While this argument has some attraction, we find it ultimately unpersuasive.

The plaintiffs' reliance on the prior restraint doctrine is, in our view, mistaken. The premise of that doctrine is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content[,]" *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972), at least where the expression so restricted is protected "speech" within the first amendment, *cf. Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031, 1034–35 (1942). It is to assure adherence to this principle that courts have required discretionary official action regulating expression to be accompanied by "rigorous procedural safeguards," *Southeastern Promotions, supra,* 420 U.S. at 561, 95 S.Ct. at 1248, 43 L.Ed.2d at 460, including prompt judicial review, *id.* at 560, 95 S.Ct. at 1247, 43 L.Ed.2d at 460; *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649, 654–55 (1965). But public funding of the arts seeks "not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge" artistic expression. *Buckley v. Valeo, supra,* 424 U.S. at 92, 96 S.Ct. at 670, 46 L.Ed.2d at 729, 44 U.S.L.W. 4154. A disappointed grant applicant cannot complain that his work has been suppressed, but only that another's has been promoted in its stead. The decision to withhold support is unavoidably based in some part on the "subject matter" or "content" of expression, for the very assumption of public funding of the arts is that decisions will be made according to the literary or artistic worth of competing applicants. Given this focus on the comparative merit of literary and artistic works equally entitled to first

amendment protection as "speech", courts have no particular institutional competence warranting case-by-case participation in the allocation of funds. *See Presidents Council v. Community School Board*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972).

There is, to be sure, a close resemblance between a governmental program directly subsidizing artistic projects and productions, and a governmental plan to construct and maintain an auditorium with public funds and to schedule dramatic and other artistic performances therein. And the Supreme Court has held that a municipal decision refusing to schedule a particular production in its auditorium on grounds of obscenity was a prior restraint of expression subject to the traditional procedural safeguards. *Southeastern Productions, supra.*[3] But we think there are significant differences between the two cases. First, the Court in *Southeastern* chose to view a public auditorium "as if it were the same as a city park or street . . . ." *Id.* 420 U.S. at 570, 95 S.Ct. at 1252, 43 L.Ed.2d at 466 (Rehnquist, J., dissenting). Such an approach finds justification in the tradition of freedom from government interference with expression in public places in our society. *See, e. g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). But there is no similar tradition of absolute neutrality in public subsidization of activities involving speech. As the Supreme Court has observed "Our statute books are replete with laws providing financial assistance to the exercise of free speech, such as aid to public broadcast-

ing and other forms of educational media, 47 U.S.C. §§ 390–399, and preferential postal rates and antitrust exemptions for newspapers, 39 CFR § 132.2 (1975); 15 U.S.C. §§ 1801–1804." *Buckley v. Valeo, supra*, 423 U.S. at 93, 96 S.Ct. at 670, 46 L.Ed.2d at 730, 44 U.S.L.W. at 4155 n. 127.[4]

Second, while it may be feasible to allocate space in an auditorium without consideration of the expressive content of competing applicants' productions, such neutrality in a program for public funding of the arts is inconceivable. The purpose of such a program is to promote "art", the very definition of which requires an exercise of judgment from case to case. Moreover, money is a more flexible instrument than a public building: an applicant may receive varying amounts depending upon his needs and the promise of his work; similarly, the quantity of available funds may vary. Solutions that may work for an auditorium, such as scheduling on a first-come-first-served basis or upon a prescribed showing of likely box-office success (if that is a solution),[5] are simply not available to a program for funding the arts. If such a program is to fulfill its purpose, the exercise of editorial judgment by those administering it is inescapable.

Plaintiffs contend nonetheless that while some consideration of content may be necessary, particular decisions should be required to follow "narrow standards and guidelines" that will insulate the result from the prejudices of the decision-maker. *See Shuttlesworth v. City of Birmingham, supra*, 394 U.S. at 150–51, 89 S.Ct. at 938–

---

**3.** Although the Court failed to confront squarely the problem of how a municipality is to resolve irreconcilable conflicts between multiple applications for use of the same facility at the same time, we think it implicit in the Court's disposition of the case that the decision must not turn on subjective official preferences. The opinion leaves it unclear, however, whether either of the Chattanooga facilities to which "Hair" was denied access went vacant during the period "Hair" applied for.

**4.** We take notice, in addition, of the myriad federal grant programs for scientific and scholarly research. *E. g.*, 20 U.S.C. §§ 461–65 (National Defense Fellowships); *id.* § 1134 *et seq.*

(graduate programs—grants and fellowships); 42 U.S.C. § 1861 *et seq.* (National Science Foundation).

**5.** Compare the Federal Communications Commission's practice of allocating the public airwaves to broadcasters according, in part, to their success in meeting the needs and interests of the viewing or listening public as measured in public surveys, *see Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants*, 22 F.C.C.2d 424, 426 (1970); *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 397 (1965).

39, 22 L.Ed.2d at 166–67. Presumably these standards and guidelines would elaborate the statutory standard of artistic and cultural significance, although just how they would further refine that standard is unclear. But however the standards are phrased, we think it would be unwise to require an objective measure of artistic merit as a matter of constitutional law. The Supreme Court has said that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems[,]" *Southeastern Promotions, supra* 420 U.S. at 557, 95 S.Ct. at 1246, 43 L.Ed.2d at 458, and it might be added that each form of governmental involvement in free expression must be similarly assessed. Attitudes toward art change, and even at one time, "it is . . often true that one man's vulgarity is another's lyric. . . ." *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, 294 (1971). In the absence of ascertainable principles by which to define artistic merit, we see no reason to demand that official discretion in this area be hedged by "narrow, objective and definite standards", *Shuttlesworth v. City of Birmingham, supra,* 394 U.S. at 151, 89 S.Ct. at 938, 22 L.Ed.2d at 167. This is not to say that the standard of artistic merit is not an important goal, *see Accuracy in Media, Inc. v. FCC,* 521 F.2d 288, 297 (D.C.Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3441 (U.S. Feb. 3, 1976) (No. 75–977) (viewing as "hortatory" the requirement of "strict adherence to objectivity and balance" in public broadcasting), but only that it and guidelines elaborating it do not lend themselves to translation into first amendment standards.

■ What is perhaps most troubling about this case is not that *Granite* should be denied public support, but that the denial should be based on a reading of just one poem in a back issue, without consideration of the overall quality of the publication either alone or as compared to competing grant applicants. But we doubt that this problem has a constitutional solution. *Granite's* claim of arbitrary treatment at the hands of the Governor and Council is essentially a claim of denial of due process. Yet in the absence of any right to public support of private expression, it seems unlikely that *Granite* has a sufficient "liberty" or "property" interest in a favorable decision to be able to claim a right to procedural regularity under the fourteenth amendment. *See, e. g., Goss v. Lopez,* 419 U.S. 565, 572–76, 95 S.Ct. 729, 735, 42 L.Ed.2d 725, 733–36 (1975); *cf. Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972).[6] And even if this hurdle were surmountable, it is difficult to say what process would be appropriate in this context. Given the ultimate necessity of subjective judgment, we doubt that the advantages of a hearing or statement of reasons would justify the cost, or that an explicit finding of insufficient artistic merit would have any more than cosmetic significance. In short, if the consideration *Granite* received was inadequate, it must look elsewhere than to the Constitution for relief.[7]

6. There is no claim that the initial decision by the Governor and Council approving the $750 grant gave the publisher a vested interest in that amount and in light of the established practice of executive review of grants exceeding $500, plaintiffs cannot assert any property entitlement arising directly from the Commission's unreviewed decision. *Cf. Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580–81 (1972).

7. That the Governor and Council should reverse the Commission does not in itself seem to us to raise a constitutional issue. While it may be argued that such a selective veto embodies the evils of governmental interference with expression without the justification of a necessary editorial function, *see* Canby, *The First Amendment and the State as Editor: Implications for Public Broadcasting,* 52 Texas L.Rev. 1123, 1134 (1973), we see little advantage to first amendment values in demanding that a single governmental agency have absolute and unreviewable discretion in allocating funds. It is ultimately the prerogative of elected officials to decide when and how to spend the tax dollar, and those administering grant programs cannot ignore the importance of continued legislative and executive confidence in their judgment. *Cf.* Jaffe, *The Illusion of the Ideal Administration,* 86 Harv.L.Rev. 1183 (1973). There may, of course, be good reason to leave

A claim of discrimination would be another matter. The real danger in the injection of government money into the marketplace of ideas is that the market will be distorted by the promotion of certain messages but not others. To some extent this danger is tolerable because counterbalanced by the hope that public funds will broaden the range of ideas expressed. *See Buckley v. Valeo, supra.* But if the danger of distortion were to be evidenced by a pattern of discrimination impinging on the basic first amendment right to free and full debate on matters of public interest, *see New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700 (1964), a constitutional remedy would surely be appropriate.[8] On where to draw the line, reasonable minds may differ. But in our view the refusal here to promote a magazine on the ground that it has published a poem entitled "Castrating the Cat", which contains language and imagery that some may find offensive, falls short of the kind of discrimination that justifies judicial intervention in the name of the Constitution. *Cf. Close v. Lederle,* 424 F.2d 988 (1st Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).

*Affirmed.*

## APPENDIX

### Michael McMahon

### CASTRATING THE CAT
— It is better to marry than to burn —
St. Paul

you may keep both balls preserved in a jar
on the mantle piece
he will be tamer more loving
to his keepers
he will not stray after cat cunt
and his urine will not smell
should he spray the mattress
— a simple swipe of scapel
along the scrotum
and it is done —
do not let the image of your own hulk
drawn down a bannister of razor blades
finger the inside of your sac
think of him as a tenor in the choir
— and it is done
the nurse washes her hands of him
yes she smiles we clipped his wings—
as above the errors flesh is heir to
like St. Simeon on his desert pole
unwashed in rags
who picked up each worm that fell
from his arm bid it eat and put it back

---

the decision to an agency whose members are familiar with the arts and relatively removed from political pressures. Yet there is also something to be said for having decisions made in the open, where they can be subjected to public scrutiny and debate, rather than "behind a screen of informality and partial concealment that seriously curtails opportunity for public appraisal and increases the chances of discrimination and other abuse. . . ." Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp.Prob. 648, 658 (1955). The question is not, in any case, "so free from doubt that courts should impose an inflexible response as a matter of constitutional law. . . ." *Public Research Interest Group v. FCC,* 522 F.2d 1060, 1067 (1st Cir. 1975).

Whether Congress or the New Hampshire legislature contemplated or authorized the power of review that was exercised here is another matter. The district court ruled that there was no statutory violation, 397 F.Supp. at 1053–54, and as this ruling is not challenged here, we have no occasion to pass on it.

8. We agree with the district court that distribution of arts grants on the basis of such extrinsic considerations as the applicants' political views, associations, or activities would violate the equal protection clause, if not the first amendment, by penalizing the exercise of those freedoms. 397 F.Supp. at 1052; *see Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577 (1972), and cases cited therein.