LEGAL SERVICES CORPORATION OF PRINCE GEORGE'S COUNTY, MARYLAND and John Evelyn Hunt

v.

Thomas EHRLICH, President, Roger C. Cramton, Chairman of the Board of Directors, Lawrence Hamblen, Regional Director, Legal Services Corporation.

Civ. No. K–77–894.

United States District Court, D. Maryland.

June 7, 1978.

Theodore L. Mast, Lanham, Md., and Francis A. Borelli, Hyattsville, Md., for plaintiffs.

E. Stephen Derby, Baltimore, Md., and Stephen S. Walters, Washington, D. C., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiff, Legal Services Corporation of Prince George's County, Maryland (Prince George's), is a nonprofit Maryland corporation which provides legal services to persons, in Prince George's County, otherwise unable to afford them. Plaintiff John Evelyn Hunt (Hunt) allegedly is "an indigent citizen" of the county. The corporate defendant, Legal Services Corporation (Legal Services), is a District of Columbia corporation created by the federal Congress in 1974 "for the purpose of providing financial sup-

port for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance."[1] *Inter alia*, Legal Services is directed by the Congress

> [to] insure that grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas * * *[2] [and]

> [to] insure that recipients solicit the recommendations of the organized bar in the community being served before filling staff attorney positions in any project funded pursuant to this subchapter and give preference in filling such positions to qualified persons who reside in the community to be served * * *[3]

Legal Services is prohibited from itself engaging in litigation unless it or a recipient of funds from it is a party.[4] Further, Legal Services and its employees are directed not to engage in political activities.[5]

The individual defendants are, respectively, the President and the Chairman of the Board of Legal Services, and the Director of the Philadelphia Regional Office of Legal Services. All defendants have moved to dismiss the complaint and in the alternative have moved for summary judgment, on various grounds. Both sides have filed affidavits. Accordingly, the pending defense motions are treated as seeking summary judgment, pursuant to Federal Civil Rules 12 and 56. Giving plaintiffs in that summary judgment context the benefit of all reasonable factual inferences, the relevant and material facts are the following:

1. The predecessor of Legal Services was the Office of Legal Services of the Community Services Administration, formerly a federal agency.

2. Defendant Hamblen was the Philadelphia regional director of that predecessor agency and has been, since October 1975, the Director of Legal Services' Philadelphia

---

1. 42 U.S.C. § 2996b(a).

2. 42 U.S.C. § 2996f(a)(3).

3. 42 U.S.C. § 2996f(a)(8).

4. 42 U.S.C. § 2996e(c)(1).

5. 42 U.S.C. § 2996e(e).

regional office. The Philadelphia region embraces all of the State of Maryland. Mr. Hamblen's "duties include monitoring and providing support for [Legal Services]-funded programs" in the Philadelphia region and making "recommendations to [Legal Services'] headquarters office regarding funding decisions" in that region.[6]

3. Shortly after it came into being, Legal Services developed a short-term plan to expand legal services, beginning in 1977 and established the following "[f]our priorities":

 a. The funds were to be divided among the states according to the number of poor persons who lived outside the geographical boundaries of legal services programs. Within states, priority would be given to areas where the largest number of poor persons resided in uncovered areas;

 b. Priority would be given to funding through administrative units that provided service to the largest number of eligible clients (including those in rural areas) in the most efficient manner;

 c. *Where the provision of service in new areas could be accomplished by expanding geographic coverage of existing Corporation-funded programs of proven effectiveness, those existing programs would be given priority*; and,

 d. In making grants, the Corporation would require a grantee to limit its geographical area, so that it was funded at a level of at least $4.90 per eligible poor person.[7]

(Emphasis supplied.)

4. In the spring of 1976, Legal Aid Bureau, Inc., Baltimore, Maryland (Balto.), which was at that time the only Legal Services-funded program in Maryland, employed 56 attorneys, was supported by grants from Legal Services and other federal, state and local services, had offices in Baltimore City, Harford and Anne Arundel Counties, and operated a senior citizens' project in Prince George's County.[8] By the spring of 1976, Balto. had expressed interest to Legal Services with regard to expanding Balto.'s geographical coverage.[9]

5. In Legal Services' opinion, Balto. conducted its activities on a well-administered basis.[10]

6. Hamblen determined, on or before September 17, 1976, that "geographical expansion of legal services in Maryland during 1977 should take place through" Balto. That decision by Hamblen was approved on or before January 1977 by Hamblen's superiors.[11]

7. On or about September 24, 1976, Mr. Martin C. Dennis (Dennis), acting Executive Director of Prince George's since September 1, 1976, wrote a letter to Hamblen stating that Prince George's desired to submit a funding proposal, involving in excess of $150,000, to "establish a three attorney, three paralegal office" to service Prince George's County, and involving an additional smaller amount to provide services in nearby Southern Maryland counties. Hamblen informed Dennis at one or more times, during October and November of 1976, in person and in writing, that "all expansion money for Maryland had been granted to [Balto.]."[12] At one time, Hamblen orally informed Dennis that Hamblen "would consider the proposal" from Prince George's "if any future funds became available for Prince George's County."[13]

Dennis, at one or more times, believed that Prince George's had not been successful in obtaining funds from Legal Services

6. Hamblen Affidavit, p. 1, ¶ 1.

7. Hamblen Affidavit, pp. 2–3, ¶ 4; Dennis affidavit, p. 4, ¶ 10 (re priority "c").

8. Balto. had by spring of 1976 closed, because of financial strictures, offices it had formerly operated in Carroll and Howard Counties.

9. Hamblen Affidavit, p. 3, ¶ 6.

10. Hamblen Affidavit, pp. 3–4, ¶ 6.

11. Hamblen Affidavit, pp. 4–5, ¶¶ 7, 13.

12. Dennis Affidavit, p. 2, ¶ 3. *See also* Dennis Affidavit, pp. 1–2, ¶¶ 1–6, inclusive; Hamblen Affidavit, p. 5, ¶¶ 10–11.

13. Dennis Affidavit, p. 2, ¶ 6.

because Prince George's had acted too late. Dennis also believed that at all relevant times Prince George's was a fully qualified agency and that there was no reason for Legal Services to select Balto. to perform services in Prince George's office in view of Prince George's availability.[14] Dennis pressed his case not only to Hamblen but to persons within Legal Services who were Hamblen's superiors, to a member of the Congress, and to others. Legal Services, however, adopted Hamblen's position.[15] At one time, apparently on December 14, 1976,[16] Hamblen "had invited" Dennis "to file an application for funding for subsequent years" but stated that he (Hamblen) had given "no consideration" to Prince George's proposal with relation to the year 1977.[17]

10. On October 14, 1976, an officer of Legal Services "stated that all funding proposals for expansion money had to be in by November 1, 1976." [18]

Jurisdiction is alternatively asserted by plaintiffs under 28 U.S.C. § 1331(a) (federal question) and § 1361 (mandamus); 5 U.S.C. §§ 551 and 702 (the Federal Administrative Procedure Act); and the fifth amendment to the United States Constitution. Regardless of whether Legal Services is an agency within the meaning of the Administrative Procedure Act,[19] that Act does not provide an independent basis for federal jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Mandamus jurisdiction is present only when the complaint raises a colorable suggestion that a government agency or official has failed to perform a ministerial duty.[20] While plaintiffs in a legal memorandum submitted to this Court assert that the duties defendants did not perform were "ministerial," that characterization is not factually supported by the record.[21] If it were necessary, this Court might take jurisdiction under 28 U.S.C. § 1361 in order to determine that mandamus jurisdiction is not present. *See Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). However, that is not necessary herein since federal question jurisdiction under 28 U.S.C. § 1331(a) is present in this case which involves $10,000 or more in controversy and arises under the Constitution and one or more laws of the United States.[22]

Plaintiffs seek damages and declaratory relief. In so doing, plaintiffs complain, *inter alia,* of violations by Legal Services of the latter's statutory duties and of denial of

---

**14.** Dennis Affidavit, pp. 2–3, ¶ 7.

**15.** Hamblen Affidavit, p. 5, ¶ 13.

**16.** Dennis Affidavit, pp. 5–6, ¶ 14.

**17.** Dennis Affidavit, p. 6, ¶ 14.
The factual contentions of Hamblen and Dennis are in conflict only in terms of their emphases and colorations. To the extent such conflicts exist, they are resolved in plaintiffs' favor. It is also to be noted that the Hamblen affidavit is not of the type of the "litigation affidavits" described as " 'post hoc' rationalizations" in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and disapproved of therein as presenting a record not sufficient for judicial review required by the Administrative Procedure Act. Accordingly, even if judicial review is mandated herein by any provision of statute or Constitution, the Hamblen. and Dennis affidavits provide an appropriate basis for decision herein. That conclusion is seemingly not challenged herein by plaintiffs.

**18.** Dennis Affidavit, p. 2, ¶ 4. The officer is not named.

**19.** *See* p. 1063, *infra.*

**20.** *See, e.g., National Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 492 F.2d 587 (1974).

**21.** *See* pp. 1062–1063, *infra.*

**22.** While not claimed, diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) may also be present if none of the individual defendants is a citizen of Maryland, since Legal Services, a District of Columbia corporation, seemingly has its principal place of business in the District of Columbia; Prince George's is a Maryland corporation with its principal place of business in Maryland; and Hunt is a citizen of Maryland.
It is also not necessary herein to explore the existence of jurisdiction under the Fifth Amendment and the reach of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Davis v. Passman,* 571 F.2d 793 (5th Cir. 1978).

constitutional due process, apparently both procedural and substantive.

### Statutory Violations

Plaintiffs assert statutory failures on the part of defendants pursuant to 42 U.S.C. § 2996e(c) and § 2996f(a)(3) and (8). Any failure under § f(a)(8) would seemingly relate to post-selection performance by Legal Services of Balto. and supervision by Legal Services of Balto. after selection, and not to issues relating to selection of Balto., or to non-selection of Prince George's by Legal Services. Accordingly, failures, if any, of Legal Services under § f(a)(8) would not appear relevant and material herein. Moreover, in any event, the record is barren of anything other than possibly a most conclusory implication that Balto. has not sought qualified persons residing in Prince George's County to fill staff attorney positions. Plaintiffs broadly assert the use of political influence by Balto. but other than alleging facts which disclose or suggest certain existing personal relationships among personnel of Legal Services and of Balto., plaintiffs have in no way zeroed in on anything close to a claimed violation of 42 U.S.C. § 2996e.

█ It is, however, with regard to 42 U.S.C. § 2996f(a)(3) that plaintiffs concentrate their attack, namely, that Legal Services did not, when it selected Balto., insure that that selection provided "the most economical and effective delivery of legal assistance" to eligible persons in Prince George's County because Legal Services gave no meaningful consideration to Prince George's proposal for 1977 before selecting Balto. The Legal Services Corporation Act, 42 U.S.C. §§ 2996–2996*l*, does not expressly or impliedly require the use of competitive bidding. Nor does that Act appear to set forth any standards for selection of grantees other than those included in the sections of the law cited *supra*. Further, the Act's legislative history known to this Court or called to its attention by counsel in this case does not disclose any guidelines requiring, inferring or suggesting selection procedures in addition to what the Act itself calls for. Rather, the Act and the legislative history confer wide latitude and discretion upon Legal Services.[23] The four priorities established by Legal Services[24] are well within that latitude and discretion. There is not a word in the record to support any finding that the selection of Balto. was not appropriate under those four priorities. With relation to priority c and the "proven effectiveness" of Balto., plaintiffs have stated in their complaint the broad assertion that Balto. "does not provide legal services to those Prince George's County residents least able to afford legal assistance." But there is nothing else in the record which even suggests that Balto. is other than fully qualified to do (and has not in fact appropriately been accomplishing) the job in Prince George's County.[25] As above indicated, the principal thrust of plaintiffs is that Legal Services acted arbitrarily and capriciously in not giving *any* meaningful consideration to Prince George's proposal. But that approach assumes that Legal Services' decision to afford *priority* to *existing* programs of proven effectiveness and in this case to Balto. is arbitrary and capricious. Whether Legal Services is viewed as a governmental, semi-governmental, non-governmental or other entity,[26] its policy decision to afford such

**23.** Thus, this is not a case such as *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), in which the applicable statute instructed the Secretary of Transportation not to construct a highway through a park if a "feasible and prudent" alternative route exists.

**24.** Quoted at pp. 1059,–1060, *supra*.

**25.** On the other hand, in the summary judgment context of this case, there is no reason to doubt the ability of Prince George's to have done and to do a qualified job if it had been chosen.

**26.** *See* 42 U.S.C. §§ 2996b, 2996e. *Cf. e.g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Roberts v. Cameron-Brown Co.*, 556 F.2d 356 (5th Cir. 1977); *Ginn v. Matthews*, 533 F.2d 477 (9th Cir. 1976); *Northrip v. Federal Nat'l Mort. Ass'n*, 527 F.2d 23 (6th Cir. 1975); *Greenya v. George Washington Univ.*, 167 U.S.App.D.C. 379, 512 F.2d 556, *cert. denied*, 423 U.S. 955, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Hines v. Cen-*

priority was not arbitrary or capricious. The Legal Services Corporation Act does not require any hearing before a grant is made. It does provide that "financial assistance," once commenced under the Act, "shall not be suspended" without "reasonable notice and opportunity [to the grantee] to show cause why such action should not be taken," [27] and shall not be "terminated," suspended for longer than thirty days, or "an application for refunding * * * denied," without "reasonable notice and opportunity for a timely, full, and fair hearing, and, when requested, such hearing shall be conducted by an independent hearing examiner." [28] By contrast, the Act does not impose any *procedural* requirement upon Legal Services with regard to the original selection of a grantee. Indeed the entire tenor of the Act bestows the greatest flexibility upon Legal Services in making such original selections. Legal Services has adopted and published certain procedural regulations.[29] But there is no indication that Legal Services has failed to follow its own regulations, assuming, *arguendo,* that such failure would give rise to a cause of

action on the part of either or both of plaintiffs.[30]

 42 U.S.C. § 2996d(e)(1) provides:

Except as otherwise specifically provided in this subchapter, officers and employees of the Corporation shall not be considered officers or employees, and the Corporation shall not be considered a department, *agency,* or instrumentality, of the Federal Government. [Emphasis added.] [31]

That language is clear. It excludes application of the federal Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–06, since the latter applies to a federal "agency." [32] Plaintiffs' contentions that the Administrative Procedure Act's hearing requirements are applicable to Legal Services' selection process are therefore not tenable.[33] Accordingly, since neither the Legal Services Corporation nor the Administrative Procedure Act requires a hearing, or any specific procedural course of conduct, by Legal Services, before the latter makes its selection of grantees, plaintiffs' complaints as to *procedural* violations by Legal Services of statutory commands may not prevail.

---

*la Community Action Comm., Inc.,* 474 F.2d 1052 (5th Cir. 1973).

27. 42 U.S.C. § 2996j(1).

28. 42 U.S.C. § 2996j(2).

29. 45 C.F.R. §§ 1603, 1606. *See also* 41 Fed. Reg. 51, 608–09 (1976) (to be codified in 45 C.F.R. § 1618); 42 Fed.Reg. 37, 551–52 (1977) (to be codified in 45 C.F.R. § 1621).

30. *Cf., e. g., Francis v. Davidson,* 340 F.Supp. 351, (D.Md.) (three-judge court), *aff'd mem.,* 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972).

31. The Federal Grant and Cooperative Agreement Act of 1977, Pub.L. No. 95–224, 92 Stat. 5 (1978) (to be codified in 41 U.S.C. §§ 501–09), enacted February 3, 1978, relates to federal grant and cooperative agreement relationships. That statute would not appear to have any retroactive effect either generally or specifically in this case. Section 3(4) thereof provides:

(4) "executive agency" means any executive department as defined in section 101 of title 5, [*United States Code*], a military department as defined in section 102 of title 5, [*United States Code*], an independent estab-

lishment as defined in section 104 of title 5, [*United States Code*] (except that it shall not include the General Accounting Office), a wholly owned Government corporation; * *

Whether Public Law 95–224 applies to Legal Services in view of the exclusionary language of 42 U.S.C. § 2996d(e)(1) is a question that need not be answered herein.

32. *See* 5 U.S.C. §§ 551(1), (13), 553–54, 701(b)(1), 702, 704, 706, which indicate that the administrative hearing and the judicial review provisions apply to federal agencies.

33. Plaintiffs urge that it takes " 'clear and convincing evidence' of a contrary legislative intent * * * [to] restrict access to judicial review." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Herein, such evidence is present in the framework of the statute and the general tone of the legislative debates. *See, e.g.,* 120 Cong.Rec. 1621–24 (1974); 119 Cong.Rec. 20725–29 (1973). However, in any event, the proposition which plaintiffs urge requires careful application in each case. *See* K. Davis, Administrative Law of the Seventies § 28.08 at 630–35 (1976).

Hereinabove this Court has held that Legal Services did not act arbitrarily or capriciously or in any way *substantively* violate any provision of the Act in selecting Balto. and in not selecting Prince George's. It is further to be noted that even if Legal Services had violated any statutory command in the Act in selecting Balto. and in not selecting Prince George's, the Act itself contains no provision permitting Prince George's to seek judicial review. Additionally, it is to be noted that there is little or no basis for implying a private cause of action under the guidelines established by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).[34]

### Constitutional Denials

■ Plaintiffs also allege that they have been denied procedural rights under the fifth amendment to the Constitution. But those rights exist only if plaintiffs have liberty or property rights with respect to obtaining grants. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In the absence of congressional creation of such rights,[35] they have no such rights, for reasons which have been well articulated by the First Circuit in *Advocates for the Arts v. Thomson,* 532 F.2d 792 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). Therein, New Hampshire state officials, grantees of federal funds, determined not to grant aid to a literary magazine named *Granite* because the latter had published "obscenities" in the past. In the majority opinion, Judge Campbell (at 795) considered the question of whether "a decision not to fund a particular arts project * * * based on nothing more than personal preferences constitutes a prior restraint of free expression." Judge Campbell also noted (at 795) that plaintiffs in *Advocates* "would not, apparently, subject public funding decisions to the full panoply of procedural safeguards applicable to official actions regulating expression in public places" but that plaintiffs in that case did urge that " 'narrow standards and guidelines' are constitutionally required to ensure that funding decisions be based on 'literary or artistic merit' rather than on the decision maker's 'prejudices or his disagreement with what is being said. . . .' " In the course of rejecting that approach, Judge Campbell wrote:

A disappointed grant applicant cannot complain that his work has been suppressed, but only that another's has been promoted in its stead. The decision to withhold support is unavoidably based in some part on the "subject matter" or "content" of expression, for the very assumption of public funding of the arts is that decisions will be made according to the literary or artistic worth of competing applicants. Given this focus on the comparative merit of literary and artistic works equally entitled to first amendment protection as "speech", courts have no particular institutional competence

---

**34.** Therein, Mr. Justice Brennan wrote:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [Citation omitted.] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Citations omitted.] And finally, is the cause of action one traditionally relegated to state

law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citations omitted.]

Plaintiff falls short under the first three tests. The fourth test is inapplicable. With specific reference to the first test and Prince George's, as opposed to Hunt's, claims herein, it is seemingly the indigent, not the grantee, for "whose especial benefit" the Legal Services Corporation Act was enacted. *See* 42 U.S.C. § 2996 ("Congressional findings and declaration of purpose.").

**35.** *Cf. Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed. 466 (1976), and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), re creation of rights by the states.

warranting case-by-case participation in the allocation of funds. * * *

*Id.* at 795–96.

Judge Campbell also stated (at 797–98):

What is perhaps most troubling about this case is not that *Granite* should be denied public support, but that the denial should be based on a reading of just one poem in a back issue, without consideration of the overall quality of the publication either alone or as compared to competing grant applicants. But we doubt that this problem has a constitutional solution. *Granite's* claim of arbitrary treatment at the hands of the Governor and Council is essentially a claim of denial of due process. Yet in the absence of any right to public support of private expression, it seems unlikely that *Granite* has a sufficient "liberty" or "property" interest in a favorable decision to be able to claim a right to procedural regularity under the fourteenth amendment. [Citations and n.6 omitted.] And even if this hurdle were surmountable, it is difficult to say what process would be appropriate in this context. Given the ultimate necessity of subjective judgment, we doubt that the advantages of a hearing or statement of reasons would justify the cost, or that an explicit finding of insufficient artistic merit would have any more than cosmetic significance. In short, if the consideration *Granite* received was inadequate, it must look elsewhere than to the Constitution for relief.[7]

7 * * * It is ultimately the prerogative of elected officials to decide when and how to spend the tax dollar, and those administering grant programs cannot ignore the importance of continued legislative and executive confidence in their judgment. *Cf.* Jaffe, *The Illusion of the Ideal Administration,* 86 Harv.L.Rev. 1183 (1973). There may, of course, be good reason to leave the decision to an agency whose members are familiar with the arts and

36. Nor are any allegations of any discrimination made. *See Perry v. Sindermann,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 894–98, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

37. Thus, there is no contention herein of race or sex discrimination or of any constitutional

relatively removed from political pressures. Yet there is also something to be said for having decisions made in the open, where they can be subjected to public scrutiny and debate, rather than "behind a screen of informality and partial concealment that seriously curtails opportunity for public appraisal and increases the chances of discrimination and other abuse. . . ." Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp. Prob. 648, 658 (1955). The question is not, in any case, "so free from doubt that courts should impose an inflexible response as a matter of constitutional law. . . ." *Public Research Interest Group v. FCC,* 522 F.2d 1060, 1067 (1st Cir. 1975).

Whether Congress or the New Hampshire legislature contemplated or authorized the power of review that was exercised here is another matter. The district court ruled that there was no statutory violation, 397 F.Supp. at 1053–54, and as this ruling is not challenged here, we have no occasion to pass on it.

Herein, plaintiffs' statutory violations are before this Court, but are lacking in merit for the reasons set forth *supra.*

In this case, no first amendment questions are raised.[36] The dimensions of plaintiffs' constitutional claims rest solely within and upon the fifth amendment's requirements as to procedural and substantive due process.[37] As to procedural due process, no liberty or property interest is involved.[38] As to substantive due process, *Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), is instructive. One of the questions posed therein (*id.* at 91, 98 S.Ct. at 956, 55 L.Ed.2d at 136) was whether substantive due process provides a basis for the grant of injunctive relief to a student against his academic dismissal from a state institution if the dismissal is " 'shown to be clearly arbitrary or capricious.' " With regard to that issue, Mr. Justice Rehnquist, for the majority, wrote (*id.* at 91, 98 S.Ct. at 956, 55 L.Ed.2d at 136):

Even assuming that the courts can review under such a standard an academic decision of a public educational institution, we agree with the District Court

failure other than as related to procedural or substantive due process.

38. Therefore, it is not necessary to determine what form of procedural due process is required. *See, e.g., Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

that no showing of arbitrariness or capriciousness has been made in this case. Courts are particularly ill-equipped to evaluate academic performance. The factors discussed in Part II with respect to procedural due process speak *a fortiori* here and warn against any such judicial intrusion into academic decisionmaking. [Footnotes omitted.] [39]

Hereinabove, this Court, in the course of holding that Legal Services did not violate any statutory command, has determined that Legal Services did not act arbitrarily or capriciously. Thus, even if substantive due process considerations constitutionally entitle plaintiffs in this case to judicial review in order to void any arbitrary or capricious conduct—an approach which the First Circuit in *Advocates* appears to reject—plaintiffs are not entitled to any relief herein since this Court holds defendants did not act arbitrarily or capriciously. It thus is not necessary to decide whether, in the absence of any provision in the enabling statute or in the Administrative Procedure Act providing for judicial review, plaintiffs herein are entitled to judicial review upon the issue of substantive lack of due process because of alleged arbitrariness or capriciousness. It is to be noted that in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court held, *inter alia,* that the arbitrary and capricious standard was applicable upon judicial review of an alleged non-performance of a legislative (as opposed to judicial) kind of function. But therein a federal agency's actions were challenged and judicial review sought under the Administrative Procedure Act, which was applicable therein and is inapplicable herein.[40] In a case such as this one, it may well be that it is within the halls of the Congress, rather than in the courts, that persons such as plaintiffs should look for all or some of the relief they seek, if they are subjected to what they allege to be inappro-

priate conduct by a special entity such as Legal Services, or even by an orthodox-type of governmental agency, in the performance by such entity or agency of a grantee-selection duty, *i. e.,* rather clearly not a judicial kind of function.[41]

### Conclusion

The record fails to disclose any statutory violation by Legal Services or any denial of Prince George's constitutional rights to procedural or substantive due process. The same is true as to plaintiff Hunt. Further, as to Hunt, while plaintiffs conclusorily allege that Hunt and other indigents in Prince George's County are being and have been denied an effective legal services program, they present no facts to suggest that Hunt has applied to Balto. for and failed to receive appropriate legal assistance, or that any other indigent resident of Prince George's County has so done.

For the reasons set forth in this opinion, summary judgment will be granted for defendants, plaintiffs to bear the costs of these proceedings.

---

**39.** *See also Moore v. East Cleveland,* 431 U.S. 498, 500–04, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

**40.** K. Davis, Administrative Law of the Seventies § 29.01–8 at 677–83 (1976).

**41.** That perhaps is the core of the message of *Advocates.* *See* 532 F.2d at 795–96 n.7, quoted *supra* at pp. 1064–1065.